Peter ELLOWAY, On Behalf of Him-
self and All Others Similarly Sit-
uated, Appellant

v.

Donna C. PATE, In Her Capacity As
Independent Executor of the Estate of
James L. Pate, James J. Postl, Terry
L. Savage, H. John Greeniaus, Brent
Scowcroft, Lorne R. Waxlax, Forrest
R. Haselton, C. Berdon Lawrence, and
Gerald B. Smith, Appellees.

No. 14–06–00062–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 1, 2007.

Thomas E. Bilek, Kelly Cox Bilek, Houston, TX, for appellants.

Michael C. Massengale, James Edward Maloney, Karlene Dunn Poll, Michael C. Massengale, Houston, for appellees.

Panel consists of Justices YATES and ANDERSON, and Senior Justice HUDSON.*

## OPINION

J. HARVEY HUDSON, Senior Justice.

This is a shareholder class action brought by, appellant, Peter Elloway, on Behalf of Himself and All Others Similarly Situated, against appellees, Donna C. Pate, In Her Capacity As Independent Executor of the Estate of James L. Pate, James J. Postl, Terry L. Savage, H. John Greeniaus, Brent Scowcroft, Lorne R. Waxlax, Forrest R. Haselton, C. Berdon Lawrence, and Gerald B. Smith, for the alleged breach of their fiduciary duties in connection with the acquisition of Pennzoil–Quaker State Company ("Pennzoil") by Shell Oil Company ("Shell"). We affirm.

## BACKGROUND

James Postl was president and chief executive officer of Pennzoil and a director of Pennzoil. James Pate was chairman of Pennzoil's Board of Directors and chairman of the executive committee. Terry Savage, John Greeniaus, Brent Scowcroft, Lorne Waxlax, Forrest Haselton, Berdon Lawrence, and Gerald Smith were members of Pennzoil's Board of Directors (the "Directors").

On February 22, 2002, Rob Routs, President of Shell Oil Products US, approached Jim Postl with a cash offer for Shell to purchase Pennzoil for the price of $18.50 per share. Postl informed Routs Pennzoil was not for sale and it was committed to, and confident in, its five-year strategic plan. However, Postl told Routs he would take the offer to Pennzoil's board. On March 5, 2002, Postl took the offer to board, which agreed that the price was not adequate, but authorized Postl to have further discussions with Shell "to see if a transaction could be negotiated that would be in the best interests of the Company's stockholders."

Postl also informed the board that he would engage the investment banking company Morgan Stanley. On March 7,

* Senior Justice J. Harvey Hudson sitting by assignment.

2002, Postl entered into an agreement for Morgan Stanley to provide Pennzoil with financial advice and assistance in connection with the proposed Shell/Pennzoil merger. In the event the sale did not go through, Morgan Stanley would receive an advisory fee of $100,000. If the sale of the company was accomplished, Morgan Stanley would receive a transaction fee to be calculated as "0.40 % of the transaction's Aggregate Value."

Also, on March 5, 2002, a compensation committee meeting was held. The committee members were Forrest Haselton, Terry Savage, and John Greeniaus. The compensation committee approved several amendments of the company's benefits in the event of a change in control: [1]

amend the company's executive severance plan with regard to a change in control of the company;

amend Pate's agreement to provide for coverage under Pennzoil's senior executive severance plan so that if a change in control of the company occurred, Pate would be entitled to, in addition to the continuation of his annual consulting fee, three times his annual consulting fee upon the date of such change in control (the "Pate agreement");

enter into an agreement with Postl providing that Postl would provide consulting and advisory services to the company for the three-year period following his termination and a consulting fee of $500,000 per year (the "Postl agreement");

amend the company's annual incentive plan (to provide a full year of benefits in the event of a change in control) and

long-term incentive plan (payout of benefits upon a change in control); and modify the definition of "change-in-control."

On March 7, 2002, Routs and Ron Blakely, Shell's chief financial officer, met with Postl and Tom Kellagher, Pennzoil's chief financial officer. Postl reviewed Pennzoil's publicly available information with Routs and Blakely. On March 8, 2002, Pennzoil and Shell entered into a confidentiality agreement. On March 13, 2002, Shell and Pennzoil had a due diligence meeting. On March 15, 2002, Routs called Postl to tell him Shell was increasing its offer to $20 per share. Postl responded that he was not prepared to recommend $20 per share to the Pennzoil board.

On March 18, 2002, Pennzoil's board had a telephonic meeting. The board addressed the indictment of its independent public accountants, Arthur Andersen, and the need to appoint other independent public accountants. Postl also informed the board Shell had indicated it was prepared to increase its proposed price to $20 per share, the companies had entered into a confidentiality agreement, and Pennzoil had retained Morgan Stanley to assist in advising Pennzoil in connection with any potential transaction. Also, on March 18, 2002, a telephonic compensation committee meeting was held, during which the committee approved recommending the granting of stock options.

On March 19, 2002, Routs and Postl met and agreed Shell's and Pennzoil's chief financial officers would meet to go over the financial assumptions Shell would use to prepare its final proposal. Blakely and Kellagher met the afternoon of March 19.

---

1. Companies often enter into agreements with their executives in anticipation of a change in control to retain key employees during the uncertainty of a potential merger or acquisition. Such agreements are referred to as change-in-control agreements or so-called "golden parachute" agreements. LINDA E. RAPPAPORT, ACHIEVING SYNERGIES IN HIGH TECH TRANSACTIONS: THE PEOPLE FACTOR, 985 PLI/Corp 73, at 76 (Apr.1997).

On March 22, 2002, Routs and Postl met. They agreed this would be the last attempt at negotiating an agreeable sales prices. Routs offered $21.50, which Postl rejected. Routs left the room for awhile and conferred with Blakely. Routs returned with a $22 per share offer, which Postl said he would recommend to the Pennzoil board.

Over the weekend, Shell learned of the change-in-control benefits. Routs was angry when he learned about the cost of the change-in-control benefits. The final cost of the change-in-control benefits was substantially more than the amount Shell had estimated. On the morning of March 25, Routs called Postl, asking him to rescind the change-in-control benefits. Postl refused. Routs considered terminating the transaction or reducing the price, but Shell did neither. On March 25, 2002, the Pennzoil board met and voted to recommend to the shareholders the sale of the company to Shell for $22 per share. Shell issued a press release announcing the merger agreement.

On August 1, 2002, a shareholders meeting was held, at which time 99% of Pennzoil's voting shareholders approved the sale of Pennzoil to Shell.[2] On October 1, 2002, Shell and Pennzoil completed the merger.

Elloway alleges the price of $22 per share paid to the shareholders was grossly inadequate and unfair. Elloway asserts each of the Directors breached their fiduciary duties of due care and loyalty under Delaware law by failing to maximize shareholder value in connection with the sale of Pennzoil.[3] The crux of Elloway's complaint is the Directors agreed to the unfair sale price to insure Shell would not walk away from the deal when it learned of the cost of the increased benefits. Elloway alleges the fact that Shell was ready and willing to pay the additional amount for the change-in-control benefits is evidence of the "cushion" the Directors had built into the $22 per share sale price, and the Directors should have obtained the additional amount in the form of an increased price per share.

Specifically, Elloway alleges the Directors breached their fiduciary duties by:

(1) failing to inform themselves of all information reasonably available to them;

(2) granting to themselves, during negotiations, substantial change in-control-benefits, which improperly motivated them to push through the acquisition regardless of whether the price was fair, and low-balling the sale price in order to build in a "cushion" to cover the increased acquisition cost resulting from the additional grants of change in control benefits;

(3) failing to take steps to maximize the value of Pennzoil by taking steps to avoid competitive bidding, and failing to make good faith attempts to solicit other potential buyers;

(4) failing to properly value Pennzoil;

(5) failing to protect against the numerous conflicts of interest resulting from their own interrelationships with the transaction; and

(6) failing to disclose all material information that would permit Pennzoil's shareholders to cast a fully informed vote.

---

2. On June 17, 2002, there were outstanding 80,602,689 shares of common stock.

3. The trial court granted Elloway's request for class certification. The First Court of Appeals affirmed the class certification order. *Pate v. Elloway*, No. 01–03–00187–CV, 2003 WL 22682422 (Tex.App.-Houston [1st Dist.] Nov. 13, 2003, pet. denied).

After Elloway rested, the trial court granted the Directors' motion for a directed verdict on Elloway's due care claim. The jury rejected Elloway's claims for breach of the duty of disclosure and duty of loyalty. The jury further found the Pennzoil shareholders' vote approving the merger with Shell was fully and fairly informed. On December 15, 2005, the trial court entered a take nothing judgment on Elloway's claims against the Directors.

### EXCULPATORY PROVISION

■ In his first issue, Elloway complains the trial court erred in granting a directed verdict on his due care claim. Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). The test for legal sufficiency is the same for directed verdicts and judgments notwithstanding the verdict. *Id.* When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id.* at 822. We credit favorable evidence if reasonable fact finders could, and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable fair-minded people to reach the verdict under review. *Id.* We must affirm the directed verdict if the record establishes any ground that entitles the movant to judgment as a matter of law, even if it was not raised in the motion. *Ibarra v. National Constr. Rentals, Inc.,* 199 S.W.3d 32, 37 (Tex.App.-San Antonio 2006, no pet.); *Westchester Fire Ins. Co. v. Admiral Ins. Co.,* 152 S.W.3d 172, 191 (Tex.App.-Fort Worth 2004, pet. filed).

The Directors argue Elloway's due care claims were negated by the exculpatory provision in Pennzoil's certificate of incorporation. Under Delaware law, a certificate of incorporation may contain:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; ... or (iv) for any transaction from which the director derived an improper personal benefit....

8 DEL.CODE § 102(b)(7).

With respect to the limitation of the Directors' liability, Article IX of Pennzoil's certificate of incorporation provides, in relevant part:

A director of this Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law as the same exists or may hereafter be amended.

■ The adoption of a charter provision, in accordance with Section 102(b)(7), bars the recovery of monetary damages from directors for a successful shareholder claim that is based on violations of the duty of care, but not for violations of the fiduciary duties of loyalty or good faith. *Emerald Partners v. Berlin,* 787 A.2d 85, 90 (Del.2001). An exculpation clause authorized by section 102(b)(7) is in the nature of an affirmative defense and, therefore, the directors bear the burden to show

they are entitled to its protection. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 752 (Del.Ch.2005), *aff'd*, 906 A.2d 27 (Del.2006).

In their answer, the Directors pleaded that Elloway's claim for monetary damages for any alleged breaches of the duty of care were barred by the limitation of liability provision in Pennzoil's certificate of incorporation. At the hearing on their motion for a directed verdict, the Directors argued there was no evidence of gross negligence to support Elloway's due care claim, and the trial court granted the directed verdict on that basis. The Directors did not argue the exculpatory provision. Elloway, therefore, contends the Directors are forcing him to litigate the affirmative defense of section 102(b)(7) for the first time on appeal, particularly when the certificate of incorporation was not in evidence at trial. Elloway further complains there were no jury findings, in accordance with section 102(b)(7), and all of the Directors's acts or omissions were in good faith and did not involve intentional misconduct or a knowing violation of the law, which are elements of proof under section 102(b)(7).

■ The Directors argue, given the jury's unchallenged finding on loyalty and good faith, there was nothing to submit to the jury. Instructions to Question No. 4, the breach-of-loyalty question, state:

> The duty of loyalty requires a director to act in good faith, to make informed decisions on behalf of the shareholders, rather than in their own interests. The best interests of the shareholders must take precedence over any interest possessed by a director and not shared by the shareholders generally.
>
> The duty of loyalty also means that, in a transaction involving the sale of a company, that [sic] the directors have the duty to act reasonably to seek the high-

est value for the stock reasonably obtainable.

The instructions accompanying Question No. 4 asked the jury to determine whether each director had: (1) acted in good faith; (2) made informed decisions on behalf of the shareholders; (3) acted in his or her own interest; (4) acted so that the best interests of the shareholders took precedence over any interest possessed by a director and not shared by the shareholders generally; and (5) acted reasonably to seek the highest value reasonably obtainable for the stock. Additionally, in a preliminary instruction, the jury was charged that the "Directors have a duty to inform themselves, prior to making a decision[,] of all material information reasonably available to them."

■ A director's duty in conducting a sale of the company is to seek out, in a manner consistent with his or her fiduciary duties, "the best value reasonably available to the stockholders." *In re Lukens, Inc. S'holders Litig.*, 757 A.2d 720, 731 (Del.Ch. 1999). *aff'd sub nom, Walker v. Lukens*, 757 A.2d 1278 (Del.2000). In a merger or sale, the director's duty of care requires the director, before voting on a proposed plan of merger or sale, to inform himself and his fellow directors of all material information that is reasonably available to them. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 368 (Del.1993), *modified on other grounds*, 636 A.2d 956 (Del.1994).

With respect to his due care claim, Elloway alleged the Directors failed to properly inform themselves of all information, i.e., the value of the change-in-control benefits and the financial health of the company, available to them, which, in turn, tainted the negotiation process, thus, preventing them from seeking the highest price reasonably obtainable. Because the elements of Elloway's due care claim

were submitted in instructions accompanying the loyalty question and the jury's negative answer to the loyalty question, Elloway's due care claim was also necessarily rejected. *See Shupe v. Lingafelter,* 192 S.W.3d 577, 580 (Tex.2006) (per curiam) (holding jury's negative finding on negligence negated unsubmitted negligent entrustment issue as a matter of law, rendering error, if any, in omission of instruction on negligent entrustment harmless); *Cooper v. Lyon Fin. Servs., Inc.,* 65 S.W.3d 197, 209 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (holding, because damages attributable to plaintiff's breach of warranty claims were the same as those for plaintiff's DTPA claim, the jury's finding of no damages on the DTPA claim rendered error, if any, in granting directed verdict on plaintiff's breach of warranty claims harmless).

Elloway complains (1) the facts forming the basis of his due care claim are different from those relating to the duty of loyalty claims, and (2) there was no jury determination on damages for breach of the duty of loyalty and, therefore, that basis for finding harmless error is absent here. To the contrary, many of the facts forming Elloway's due care and loyalty claims are the same. In any event, the key point Elloway misses is the elements of his due care claim were the same as those submitted to the jury on his loyalty claim. Elloway has not asserted that the instructions accompanying the breach-of-loyalty issue were in any way incorrect.

■ Moreover, Elloway did not present sufficient evidence. Director liability for breaching the duty of care is predicated on a showing of gross negligence. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by*

*Brehm v. Eisner,* 746 A.2d 244 (Del.2000). To overcome the presumption that the Directors acted on an informed basis, Elloway must show gross negligence. *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 985 (Del.Ch.2000). Gross negligence is a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason. *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 192 (Del.Ch.2005), *aff'd,* 906 A.2d 114 (Del. 2006).

■ Elloway contends he produced substantial evidence the Pennzoil board was recklessly informed about critical issues and acted outside the bounds of reason. Elloway first asserts the Directors, with the exception of Pate and Postl, "wholly ignored the issue" of synergies. Synergies are the aspects of the a merger that allow the acquiring company to enhance its earnings, for example, by eliminating overlapping areas. Elloway alleges Pate, Postl, and Morgan Stanley concealed the value of the merger synergies from the rest of the board. Director Greeniaus testified that someone said synergies were not relevant to the seller in the transaction.

Morgan Stanley calculated the synergies of the merger. At its presentation to the board on March 25, Morgan Stanley did not include synergies, although it did when it was working with Postl during negotiations with Shell.[4] However, contrary to Elloways' allegation, Postl testified synergies were reviewed with the board in terms of what Shell was prepared to pay.

Elloway also asserts Postl and Pate concealed from the remaining Directors how well Pennzoil was performing financially at

4. Stephen Trauber of Morgan Stanley explained synergies would not be helpful in assessing the fairness of the transaction, but would be helpful to assess how much Shell could afford to pay for the company and to try to negotiate a higher purchase price.

the time of the proposed transaction, and further that those Directors made no effort to determine for themselves the company's then current performance. According to one of Elloway's expert witnesses, Prof. Bernand Black, it was Pate's and Postl's responsibility to give updated financials or projections to the other board members, but the other board members still should, and could, have asked for that information.

Again, contrary to Elloway's assertion, the minutes of the March 5, 2002 board meeting state Postl "provided a projection of first quarter earnings and financial performance by each business." Director Gerald Smith testified the board, at the March 5 meeting, was told the first quarter looked promising, but two key areas—consumer business and international business—were not doing as well. Also, Prof. Black further stated, "I did not mean to convey the impression that [the Directors] were unaware of how the company was doing."

■ Elloway further contends the Directors did not exercise "an extra level of care and attention" in choosing a sales process to insure they obtained "the highest price ... for the shareholders." Prof. Black opined the board "should take overall charge ... of the major decisions that are going to be made; ..." such as conducting an auction or looking for alternative buyers. In documents prepared for Pennzoil management for negotiation purposes, Morgan Stanley advised Pennzoil management it had a fiduciary duty to shop the company to other potential buyers in the absence of a public auction.

■ Once the merger was announced, by definition, Pennzoil was available and on the market. No other companies approached Pennzoil interested in a merger, and in the months following the announcement, Pennzoil's stock never traded at $22, but just below. Postl testified the issue of other potential buyers was discussed with the board, but it was concluded there were no other credible buyers. An auction is held when there is confidence that there is a lot of interest and competition. Here, with no other credible buyers, holding an auction would not make sense.[5] Several witnesses testified that even when Pennzoil's stock had fallen to $9 or $10 the previous year, no one approached Pennzoil about buying the company.[6] The duty to take reasonable steps to secure the highest immediately available price does not invariably require the board to conduct an auction process or a targeted market canvass because there is no single blueprint for fulfilling the duty to maximize value. *In re Toys "R" Us, Inc.*, 877 A.2d 975, 1000 (Del.Ch.2005); *see also Crescent/Mach I Partners, L.P.*, 846 A.2d at 985–86 (citations omitted) ("Generally, when a board of directors is considering a single offer[,] fairness requires a canvass of the market to determine if higher bids can be elicited. However, if the directors possess a body of reliable evidence with which to evaluate the fairness of the transaction[,] they are permitted to approve the transaction without conducting a canvass of the market.").

5. Stephen Trauber of Morgan Stanley similarly testified his team looked at a wide range of companies that might have a strategic interest in Pennzoil, ranging from consumer companies to automotive type companies. Morgan Stanley concluded there were no other likely buyers for Pennzoil for a number of reasons, including lack of a strategic fit or antitrust issues. With no other serious buyer, it made no sense to hold an auction. Morgan Stanley discussed this with the board.

6. Routs testified, when Pennzoil stock was trading at $9 or $10, Shell was prohibited by contractual arrangements with Texaco from acquiring another oil company. Shell viewed this as a missed opportunity.

■ Elloway asserts the Directors failed to inform themselves about the conflicts of interest arising from the March 18 stock option grants. The date for pricing the stock option grants was March 18, which was trading considerably lower than the $20 offer then on the table. Elloway further argues the trial court ignored the evidence of insider trading as shown by the following exchange:

Court: You don't have to repeat the facts. How does that rise to a level of gross negligence, which has been defined under Delaware law as reckless indifference to or a deliberate disregard of the whole body of stockholders or actions also which are without the bounds of reason? The testimony has been that it is routine for directors to increase their compensation.

Plaintiff's Counsel: Not during the merger negotiations, not at the time—they went—the stock options were being granted as a result we are saying of insider trading. I mean, if you are not showing something that is consciously indifferent at this point, you have Shell saying that this was insider trading.

Court: If you will remember I limined that out. So that evidence is not in the record, that is insider trading.

Elloway argues the trial court based its ruling on a fundamental misunderstanding of the record when it believed no evidence that the grant of stock options to top executives amounted to insider trading was in the record. Although the trial court had granted the Directors' motion in limine on the issue of insider trading, Elloway asserts testimony regarding insider trading came in without objection through Prof. Black, Brian Folely, another of Elloway's experts, and Ron Blakely, Shell's chief financial officer. Elloway argues under the trial court's directed verdict analysis, proof of insider trading was necessary to rebut a motion for directed verdict on the due care claims, but the court simply ignored the evidence.

The Directors respond that Elloway's allegation of insider trading is a mischaracterization of the record. Prof. Black, Foley, and Blakely [7] testified *if* Pate and Postl had purchased stock on the *public* market on March 18, with the knowledge that Shell had an offer on the table to purchase the company, then there would be insider-trading implications. There was no testimony that the situation here *was* insider trading.

Several witnesses testified Pennzoil had granted stock options on an annual basis and, with the exception of the 2001 stock options, Pennzoil usually granted those options in March. Moreover, Director Terry Savage, who was a member of the compensation committee, testified the process for developing the list for options began before the February 22 overture by Shell. To grant stock options, the company had to determine how many options it was going to grant. Towers Perrin, Pennzoil's outside compensation consultant, performed that calculation. Mark Esselman, senior vice president of human resources at Pennzoil, explained he would make recommendations to Postl regarding the allocation to each business unit by looking at how many people at different levels each business unit had. Charles Essick of Towers Perrin testified February 2002 billings showed Towers Perrin was involved in the March stock options grants.

7. However, Blakely, as well as Lisa Davis, who led the team supporting the negotiations, testified Shell was aware of the March stock option grants and understood the grants were made annually, were part of Pennzoil's normal course of business, and were granted on a company-wide basis, not just for key executives.

Furthermore, the stock options were company-wide, not just for key executives. The stock options were important because Pennzoil employees had been working without pay raises. When the options were granted, Shell had increased its offer from $18.50 to $20 per share, which the Directors felt was still inadequate. The Directors testified they did not know, at that time, if Shell would offer an acceptable price and a merger would be accomplished. Finally, Elloway's argument to the trial court belies his position on appeal that there was evidence of insider trading. During the hearing on the motion in limine, Elloway's counsel stated, "[w]e're just saying that [granting the options] was like insider trading, that's all we're saying. We're not saying it is insider trading."

■ Elloway also contends there was no consultation with Towers Perrin regarding the March compensation amendments and such amendments were approved in a hasty manner. The process regarding the complained of compensation changes, i.e., change-in-control benefits, started the previous October, as stated in the minutes of the October 4, 2001 compensation committee meeting and explained by the testimony of Director Savage, a member of the compensation committee. The minutes of the December 11, 2001 compensation committee meeting reflect that Charles Essick of Towers Perrin participated in that meeting and it was on the meeting's agenda to review and approve changes to the annual[8] and long-term incentive plans.[9] With respect to Pate's and Postl's respective consulting agreements, Towers Perrin was not involved. Savage explained the consulting agreements were not a question for Tow-

er Perrin's advice, but a business decision of the compensation committee.

Elloway complains, in assessing changes to Pate's and Postl's compensation arrangements, the Directors did not assess the precise value of their existing benefits in the event of a change in control against the precise value of the purportedly new benefits. Elloway alleges had the Directors asked, they would have learned the improvements granted during the March 5 and March 18 compensation committee meetings and March 25 board meeting were $85 million. Elloway contends Shell would have paid more to the shareholders for the company, instead of paying management for substantially increased change-in-control benefits.

Shell had estimated the total transaction cost for the merger, including change-in-control benefits, was $20 million. Between the Friday Postl agreed to recommend the $22 offer to the board and Pennzoil's Monday board meeting, Shell learned of the amount of the change-in-control benefits exceeded the amount it had estimated. Routs and Blakely were angry about the increased amount because they did not feel Postl had been forthcoming at the due diligence meeting when the issue of change-in-control benefits came up. The morning of March 25, Routs called Postl, asking him to rescind the changes to the change-in-control benefits. Postl refused. Routs had considered reducing the per share purchase price or terminating the deal. Shell's lawyers advised Routs the change was not material. Shell did not reduce the $22 per share price or walk away from the deal.

Routs requested and received authority from Shell's committee of managing di-

---

**8.** Thousands of employees are included in the annual incentive plan. Bonuses had not been paid out the year before under the annual incentive plan.

**9.** There were about 50 participants in the long-term incentive plan.

rectors to negotiate with an offer of up to $20 per share, leaving open the option that he could request an additional $2. Routs did not have the authority to offer more than $22, and Routs stated there were no circumstances under which he would have gone back to the Shell's board to ask for authority to offer more than $22 per share. Similarly, Lisa Davis, who led the team that supported Shell's negotiations, did not recommend that Routs request authority to offer more than $22 per share because Pennzoil was not worth more than that.

 Elloway also relies on figures contained in Pennzoil's five-year strategic plan, which had been in place since the summer of 2001, as evidence the Directors did not seek the highest available price from Shell. Postl explained a strategic plan, by its nature, is optimistic, i.e., it assumes success, and it is used to motivate the company's employees. The plan, which was described as "very aggressive," forecasted Pennzoil's stock would be worth $25 by the end of 2005. Several witness testified, however, to achieve that price, every assumption in the plan would have to be met with no room for risk or uncertainty. As Director Gerald Smith explained, "if all things went according, the sun and moon and all the stars were aligned, there was a possibility we could hit [the plan], but clearly [the plan] was aggressive and optimistic." Similarly, Stephen Trauber of Morgan Stanley viewed the plan as "extraordinarily aggressive."

Pennzoil admitted to Blakely its five-year strategic plan "had some stretch in it." Pennzoil management viewed the chances of achieving the plan as "50/50." Blakely testified Shell attributed more risk in the plan than Pennzoil had. Pennzoil management said the company was doing well as compared to the plan, but that was not the basis on which Shell calculated long-term values. Davis also testified Shell viewed Pennzoil as a low-growth business, and believed the strategic plan was very optimistic and it did not affect Shell's valuation of Pennzoil.

The Directors testified they believed $22 per share was a very good price for the company. It represented a 55.5 percent premium over Pennzoil's stock's trading price four weeks prior to the announcement of the merger, a 42 percent premium over Pennzoil's trading price on March 22—the day Routs and Postl agreed to the $22 per share price, and a 33 percent premium over Pennzoil's all-time high trading price of $16.50 per share.[10]

Also, Pennzoil had not been operating without problems. Two major components in achieving the strategic plan were the growth and success of Pennzoil's consumer business and international business. The previous year, Pennzoil had cut it's investment grade dividend by 80 percent so it could invest more in the company. Pennzoil's stock fell to around $9 or $10 per share. Pennzoil's investment rating was downgraded, making it more expensive to borrow money, and more expensive and difficult to raise capital to invest in and expand its consumer and international businesses. Pennzoil had a strong position

---

**10.** In the "Statement of Facts" section of his appellate brief, Elloway includes a discussion of a 1998 attempted hostile takeover of Pennzoil by Union Pacific Resources ("UPR"), apparently in support of his position that the $22 per share price was inadequate. According to Elloway, the board rejected an offer equivalent to $40 per share for Pennzoil's lubricants/consumer products division. Gerald Smith, who was on the board at the time, explained the board rejected the offer because the UPR transaction was not an all-cash transaction like the Shell transaction, UPR was highly leveraged and was not a triple rated company, and it was questionable whether UPR could even go through with transaction.

in the lube market, but that market was shrinking and it had significant competition.

Finally, as Director Smith testified, he was a shareholder with no stock options, so his position was the same as that of any other shareholder. Because the board members were paid a fee for serving as directors, if they had really wanted to take a position to advance their alleged self-interests, they would have kept the company going to continue receiving their fees.

Elloway also alleges the Directors failed to disclose certain information in the Proxy so the shareholders could make an informed vote on the merger. Elloway asserts the Directors failed to disclose (1) Morgan Stanley's estimated synergies were not part of its presentation to the board; (2) Pennzoil's internal earnings estimates exceeded those of Wall Street analysts; (3) management requested, in March, and received additional change-in-control benefits totaling $84.9 million; (4) additional change-in-control benefits were not disclosed to Shell until after the $22 price had been agreed upon; and (5) stock options were granted when Shell's $20–offer was pending. Elloway also complains the Proxy misrepresented that executive benefits were vetted by Towers Perrin, and understated the total change-in-control benefits received by top executives by $4 million.

The Proxy informed shareholders that Pennzoil's directors had been named in two lawsuits filed on March 28, 2002, and April 4, 2002, seeking class certification on behalf of Pennzoil shareholders. The Proxy explained the petitions alleged the directors had breached their fiduciary duties in connection with the proposed sale of Pennzoil to Shell at a price alleged to be grossly inadequate and unfair. The petitions further alleged the directors derived unspecified personal financial benefits from the acquisition at the expense of Pennzoil's shareholders. Finally, the Proxy gave the styles and cause numbers of the two lawsuits, which sought to enjoin the sale of Pennzoil to Shell.

Moreover, these are essentially the same complaints Elloway raises with regard to either the concealment of information from the Directors or the Directors' failure to inform themselves which are without merit. We conclude Elloway has not presented evidence that the Directors' conduct constitutes gross negligence. Elloway's first issue is overruled.

### JURY INSTRUCTION

In his second issue, Elloway contends the trial court submitted an irrelevant affirmative defense to the jury in the form of a prefatory instruction. We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Shupe*, 192 S.W.3d at 579. An abuse of discretion occurs when the trial court acts without reference to guiding principles. *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The jury should not be burdened with surplus instructions. *Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex.1984).

The complained of prefatory instruction states:

A director may rely in good faith upon the records of the corporation and such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation, but a

director may not avoid his or her active and direct duty of oversight in connection with the merger. Directors have a duty to inform themselves, prior to making a decision of all material information reasonably available to them.

The prefatory instruction is derived from 8 DEL.CODE § 141(e), which states: A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

8 DEL.CODE § 141(e).

Elloway complains the instruction is an affirmative defense.[11] Elloway contends, by including the instruction as a prefatory instruction, the trial court, in effect, granted a directed verdict on the Directors' good faith defense to his loyalty and non-disclosure claims relieving them of the burden of proving their defense. The Directors, on the other hand, contend section 141(e) is generally not considered to be an affirmative defense under Delaware law, but is a presumption or a factor to be applied to a variety of inquiries under Delaware law.[12] For reasons ex-

plained below, we need not determine whether section 141(e) is an affirmative defense because error, if any, in the submission of it as a prefatory instruction was harmless.

■ Elloway next maintains section 141(e) is applicable only to his breach of care claims, not his breach of loyalty claims. *See, e.g., Crescent/Mach I Partners, L.P.,* 846 A.2d at 985 (stating section 141(e) provides directors are protected from a breach of the duty of care). Elloway argues the protections afforded by section 141(e) do not apply on its face because a breach of the duty of loyalty occurs when a director is acting in his own self interest, not for the benefit of the corporation. Therefore, according to Elloway, the trial court should not have submitted the section 141(e) instruction in light of the directed verdict granted on his claims for breach of the duty of care. Elloway relies on *Levermann v. Cartall,* which held the prefatory instruction was improperly included in the court's charge because it "did not refer to any particular issue or term used in the charge and could only be considered by the jury as applying to the case as a whole." 393 S.W.2d 931, 935 (Tex.Civ.App.-San Antonio 1965, writ ref'd n.r.e.).

The Directors assert *Levermann* is not applicable because the prefatory instruction here was not superfluous because section 141(e) is not limited to due care claims, but is relevant to the claims submitted to the jury. *See, e.g., McMillan,* 768 A.2d at 505 n. 55 (stating board's reliance on investment banker is another factor weighing against the plaintiffs' abili-

---

**11.** *See, e.g., Manzo v. Rite Aid Corp.,* No. Civ. A. 18451–NC, 2002 WL 31926606, at *3 n. 7 (Del.Ch. Dec.19, 2002) (stating "the protections of § 141(e) would constitute an affirmative defense for which evidence may be brought at trial").

**12.** *See, e.g., McMillan v. Intercargo Corp.,* 768 A.2d 492, 505 n. 55 (Del.Ch.2000) (citing section 141(e) as a "factor" weighing against claims for breach of the duty of loyalty).

ty to state actionable claim that the directors breached their duty of loyalty for failure to secure highest value reasonably attainable); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1175 (Del.1995) (noting board's reliance on reports by investment firms and experienced counsel as evidence of good faith and overall fairness of process of merger); *In re W. Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192, at *23 (Del.Ch. May 22, 2000) (holding committee could and did reasonably rely on its expert advisor determining whether special committee was fully and fairly informed); *In re RJR Nabisco, Inc. S'holder Litig.*, No. CIV. A. 10389, 1989 WL 7036, at *16 (Del.Ch. Jan.31, 1989) (stating special committee appropriately relied on financial advisors finding it acted good faith). Delaware courts have applied section 141(e) when considering claims other than breach of the duty of due care. We reject Elloway's contention.

Finally, Elloway complains the Delaware Supreme Court has held this affirmative defense is unavailable as a matter of law "when a board is deceived by those who will gain from such misconduct." *Mills Acquisition Co. v. Macmillan*, 559 A.2d 1261, 1284 (Del.1989). Elloway asserts he has adduced substantial evidence that Postl and Pate deceived the Directors by concealing material information regarding merger-related synergies and Pennzoil's updated positive financials.

In *Mills*, two members of senior management (chairman and chief executive officer, and president and chief operating officer) of the acquired company would have had a substantial ownership in the new company. *Id.* at 1272. While the board was under the impression that the bids to acquire the company were the result of a fair and unbiased auction process, the chairman and president both remained silent, concealing from the other directors their misconduct during the auction to skew the result. *Id.* at 1277. The court determined there was no board planning and oversight to insulate the self-interested management from improper access to the bidding process. *Id.* at 1282.

The facts in this case are distinguishable from the egregious facts in *Mills*. As the Directors point out, this case does not involve any directors who had an interest in, or stood to acquire an interest in, the acquiring company by virtue of the merger, i.e., there is no evidence Pate or Postl stood on both sides of the transaction. Instead, Pate's and Postl's alleged interests were the change-in-control benefits and stock option grants. Simply because a director stands to gain financially through change-in-control benefits does not mean the director has a financial interest in the merger so that the board may not delegate negotiating authority to that director. *Cf. Wisconsin Inv. Bd. v. Bartlett*, No. C.A. 17727, 2000 WL 238026, at *6 (Del.Ch. Feb.24, 2000) (holding, unlike *Mills*, it was within board's business judgment to delegate authority to director to negotiate the merger, incentivized by a fee tied to the best result he could obtain for all shareholders).

It was within the board's business judgment to delegate authority to Postl to negotiate with Shell. There is no evidence (1) the Directors completely abdicated their responsibility of oversight of the negotiations to Postl and Morgan Stanley; (2) Pate or Postl controlled the rest of the Directors; or (3) Pate and Postl concealed certain information such as merger-related synergies or Pennzoil's financial status for the first quarter of 2002 from the rest of the Directors.

The prefatory instruction not only tracks the language of section 141(e), but also contains the following additional language from *Mills*, "a director may not

avoid his or her active and direct duty of oversight in connection with the merger. Directors have a duty to inform themselves, prior to making a decision of all material information reasonably available to them." Thus, the jury was instructed the directors still had the responsibility of oversight of the negotiation process and informing themselves of all material information reasonably available to them.

Elloway has not demonstrated that error, if any, in submitting the section 141(e) instruction as a prefatory instruction, that probably caused the rendition of an improper judgment. TEX.R.APP. P. 44(a)(1); *Wal–Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 723 (Tex.2003). Elloway's second issue is overruled.

## COMMENT ON THE WEIGHT OF THE EVIDENCE

 In his third issue, Elloway complains the trial court commented on the weight of the evidence. A trial judge's statement during the course of trial impermissibly comments on the weight of the evidence if " 'it indicates the judge's opinion concerning a matter to be determined by the jury.' " *In re M.E.C.,* 66 S.W.3d 449, 458 (Tex.App.-Waco 2001, no pet.) (quoting *Knoll v. Neblett,* 966 S.W.2d 622, 640 (Tex.App.-Houston [14th Dist.] 1998, pet. denied)). We review a trial judge's purportedly improper comments as a matter of law. *In re Commitment of Barbee,* 192 S.W.3d 835, 847 (Tex.App.-Beaumont 2006, no pet.). The complaining party must first show the comment was improper and second that the improper comment prejudiced the complaining party. *Id.* at 847 (citing *Metzger v. Sebek,* 892 S.W.2d 20, 39 (Tex.App.-Houston [1st Dist.] 1994, writ denied)).

Elloway asserts the trial court improperly commented on the weight of the evidence when it referred to Shell as "just a witness" during voir dire. During voir dire, immediately after asking the voir dire panel whether anyone knew Elloway or any of his attorneys, Elloway's attorney stated:

> One of the things that this case involves is a transaction between Shell and Pennzoil. One of the things that you're going to hear about is Shell's side of the story. You are going to hear the Shell executives talk about their view of this transaction. Is their anybody here that has worked for Shell or has had a family member that worked for Shell?

Elloway's attorney then proceeded to question a number of prospective jurors about their respective relationship with Shell and any potential bias in favor of, or against, Shell. The trial court asked Elloway's attorney to approach the bench where an unrecorded conference was held. Elloway's attorney then stated to the voir dire panel:

> Again, and just so that it is clear because the court wants to make sure I was being clear, is that Shell witnesses will testify in this case. Now, there will be people who negotiated the transaction. There will be people at very high levels in Shell. And I am concerned that you might lean in favor or give greater weight to the testimony of somebody from Shell because of your experience with Shell, and if you do I just need for you to tell me that that might be some that you—

Elloway's attorney then continued to question potential jurors about their relationships with Shell. The Directors' attorney eventually spoke up that Shell was not a party and following exchange occurred:

> MR. MALONEY [Pennzoil's counsel]: Your Honor, this is not necessarily an objection. I think this panel needs to understand that Shell is not being sued here.

* * *

MR. MALONEY: I think that is an important point. It does sound like Shell is a defendant.

THE COURT: Mr. Thompson [Elloway's counsel], I would like you to make clear to the jury panel that Shell is not a defendant, to the extent that you've been asking these questions, they are just a witness.

MR. THOMPSON [Elloway's counsel]: Shell is not a defendant in this case; ...

* * *

MR. THOMPSON: Although Shell is not a defendant in this case, the issue in this case is whether or not the transaction where Shell purchased Pennzoil–Quaker State was a fair deal for the shareholders. That is what this is about.

Elloway contends Shell was not just a witness, but was the real party in interest because it had indemnified the Directors and was liable for any judgment against Pennzoil.

■ To preserve error for appeal, the party must object when the comment occurs and request an instruction unless proper instructions cannot render the comment harmless. *In re Commitment of Barbee*, 192 S.W.3d at 847 (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) (per curiam)). Elloway failed to object to the trial court's comment and to request an instruction. Therefore, he has waived this issue on appeal.

■ Moreover, even if Elloway had not waived this issue, we conclude the trial court did not comment on the weight of the evidence because Shell's indemnification agreement with Pennzoil was not an issue that was to be submitted to the jury. *See M.E.C.*, 66 S.W.3d at 458 (explaining the trial court impermissibly comments on the weight of the evidence if it concerns a matter to be determined by the jury). In any event, Elloway was permitted to question the panel extensively about their potential bias for or against Shell. Moreover, even if the trial court's comment could be construed as a comment on the weight of the evidence, the impression that Shell was a witness free from any bias or interest in the case was cured by Rout's admission that Shell had a potential financial interest in the outcome of the case. Elloway's third issue is overruled.

### STANDING

■ In a final issue raised by the Directors, they assert the merger eliminated Elloway's Pennzoil stock ownership and, therefore, his standing to maintain a derivative claim on behalf of Pennzoil was extinguished upon merger.

■ A derivative claim is brought by a stockholder, on behalf of the corporation, to recover harm done to the corporation. *Tooley v. Donaldson, Lufkin & Jenrette*, 845 A.2d 1031, 1036 (Del.2004). A stockholder's direct claim must be independent of any alleged injury to the corporation. *Id.* at 1039. If the stockholder's claim is derivative, the stockholder loses standing to pursue his claim upon accomplishment of the merger. *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1244–45 (Del. 1999). A stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such claim even after the merger at issue has been consummated. *Id.* at 1245. To state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty in unfair dealing and/or unfair price. *Id.* at 1245.

The Directors filed a motion to dismiss for lack of subject matter jurisdiction arguing Elloway could not bring a stockholder's derivative suit because such suit belonged to the corporation and no longer existed. *Pate*, 2003 WL 22682422, at *1. The trial court denied the Directors' motion to dismiss and entered an order permitting the Directors to pursue an interlocutory appeal under Section 51.014(d) of the Texas Civil Practice & Remedies Code.[13] *Pate*, 2003 WL 22682422, at *1. The First Court of Appeals concluded Elloway had challenged the fairness of the merger, thereby stating a direct claim, and affirmed the trial court's order. *Id.* at *3.[14] The Texas Supreme Court denied the Directors' petition for review.

In this appeal, the Directors reassert Elloway's purported lack of standing, arguing the evidence presented at trial shows Elloway's claims were derivative, i.e., wasting corporate assets. We disagree. At trial Elloway clearly was trying make the case that the Directors had breached their fiduciary duties, resulting in their failure to seeking and obtain the highest price reasonably available. That he was not able to produce sufficient evidence of those alleged breaches does not mean he lacks standing. The Directors' issue is overruled.

Accordingly, the judgment of the trial court is affirmed.

---

**13.** Tex. Civ. Prac. & Rem.Code Ann. § 51.014(d) (Vernon Supp.2006).

**14.** Reviewing the petition, the First Court of Appeals noted Elloway alleged the merger had occurred by an unfair process that resulted in an inadequate price, and the Directors had breached their fiduciary duties by failing to maximize shareholder value, failing to provide fair and full disclosure of all material information related to the merger, doing virtually no preparation or due diligence, using an outdated strategic plan, approving Shell's offer without shopping the company to other prospective buyers or undertaking a market check, and granting new benefits while merge negotiations were taking place, giving them an incentive to approve the merger rather than seek a more favorable price for the shareholders. *Pate*, 2003 WL 22682422, at *3.